**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 25-CR-318 (TSC)** |
| **v.** | : | |
| | : | |
| **KEONTE WILSON,** | : | |
| | : | |
| **Defendant.** | : | |

### THE UNITED STATES' MEMORANDUM IN OPPOSITION
### TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

The United States of America, by and through its attorney, the United States Attorney for the

District of Columbia, respectfully submits this opposition to the defendant Keonte Wilson's Motion to

Suppress Evidence and Statements, filed at ECF No. 24 (the "Motion"). For the reasons set forth below,

and any facts and authorities to be relied upon in a hearing on the matter, the Court should deny the

defendant's Motion.

### BACKGROUND[1]

### *The Charged Offense*

On the evening of August 28, 2025, Metropolitan Police Department ("MPD") officers

with the assistance of federal officers were patrolling in the area of the 1400 block of V Street,

NW, a high crime area. Within six months of the date of the instant case, there have been at least

17 reports of illegal gun possessions, two reports of robberies, two reports of carjackings, and one

report of a burglary occurring within a 200-meter radius of that block of V Street.[2]

---

[1] This factual summary is being provided only as background information to aid the Court in considering the United States' memorandum. It is not a complete description of all facts and evidence that might be established and admitted at a hearing or at trial.

[2] The defendant himself was arrested twice and convicted once (2015 CF2 017279) for gun charges occurring within the area of the 1400 block of V Street.

At approximately 8:55 p.m., officers observed five individuals congregating on the southside sidewalk of the 1400 block of V Street. At the time, the officers were travelling westbound on V Street in unmarked vehicles at a normal rate of speed. The MPD officers led the patrol and were in one vehicle. Officer Byron Alarcon was driving, Officer Anthony Delborrell was in the front passenger seat, Officer Mohamed Taher was in the rear driver's side seat, and Officer Noah Duckett was in the rear passenger's side seat. Both the MPD and federal officers stopped their vehicles approximately 100 feet from the corner of V and 14th Streets. The MPD officers were in full uniform. The federal officers were wearing tactical vests that displayed the acronyms of their home agencies. None of the vehicles had their emergency lights activated.

The MPD officers exited their vehicle with their flashlights out and approached the group. Three males were behind a planted area closer to 14th Street. The defendant and a female were roughly 20 feet west of the males in the middle of the sidewalk between a planted area and a gate.

**Figure 1. A snip from Officer Delborrell's body worn camera ("BWC"). The three males are circled in yellow. The defendant is circled in red. The female is circled in purple.**



The four MPD officers split up into two groups. Officers Taher and Officer Duckett approached the three males near the planted area, and Officers Delborrell and Alarcon walked towards the defendant and the female. The federal officers did not actively engage with the five individuals until after the defendant was seized.

### Officers Taher and Duckett

Officer Taher, who was followed by Officer Duckett, approached the three males and greeted them. One of the males, who was wearing a white shirt ("Male-1"), was seated at the planted area. The two other males—one wearing a T-shirt ("Male-2) and the second wearing a black hooded sweatshirt ("Male 3")—were standing. Officer Taher was not yelling. He did not have his gun drawn.

| | |
|---|---|
| Officer Taher: | How ya'll doing today? |
| Males: | [Unintelligible.] |
| Officer Taher: | What's going on? |
| Male -1: | [Unintelligible.] |
| Officer Taher: | Just chilling? |
| Male-1: | We chilling. |
| Officer Taher: | Huh? |
| Male-1: | Yea. We chilling. |

As Officer Taher was exchanging pleasantries with the males, he and Duckett walked around the males to the right of Male-2 and Male 3. Officer Taher then spoke with Male-3.

| | |
|---|---|
| Officer Taher: | What's up man? |
| Male-3: | What's up bud? |
| Officer Taher: | Good. |

> Male-3:                It's all good.
>
> Officer Taher:         I see.

As Officer Taher was speaking with Male-3, Male-3 began to raise his hands.

> Officer Taher:         Nah, you're good man. You don't got to put your, you don't got to put your hands up.

Officer Taher began to turn away from Male-3 and walk towards the street. At this point, a number of the federal officers were out, but stayed on the street and away from the five individuals.

**Figure 2. A snip from Officer Taher's BWC footage. The MPD officers' white unmarked car is to the right of the snip. The federal officers (circled in orange) are seen walking on the street.**



Officer Duckett then circled around the three males and looked in the direction of the defendant and female. Male-1, who appeared to be annoyed by the police presence, then questioned Officers Taher and Duckett about what the police were doing there. Officers Taher and Duckett focused on Male-1 and listened to his concerns in a thoughtful manner but politely pushed back with regards to Male-1's negative characterization of their patrol.

**Figure 3. A snip from Officer Taher's BWC footage. Officers Taher and Duckett speaking with Male-1. Officer Duckett is to the left of the snip.**



Thereafter, Officer Delborrell, who just frisked the defendant, yelled "1-800," the codeword for firearm. Officers Taher and Duckett then ran to the defendant and help detain him.

### Officers Delborrell and Alarcon

After stopping their vehicle, Officer Delborrell, who was followed by Officer Alarcon, took the lead and began walking towards the defendant. Officer Delborell has worked with MPD since 2015. Officer Delborrell has been involved in hundreds of investigations during which firearms were recovered. Further, for approximately five years, Officer Delborrell has been working as an MPD instructor regarding the "observable actions of an armed suspect."

Upon approach, the defendant appeared to be nervous to Officer Delborrell—the defendant became "wide eyed" and began to look around. Officer Delborrell believed that the defendant was looking for an avenue of escape. Officer Delborrell then decided to speak with the defendant. Officer Alarcon, however, teetered back and forth from looking at the three males and the defendant and female and stopped about midway between the two groups. One federal officer

walked approximately fifteen feet past the defendant (to the defendant's left) but did not directly interact with the defendant or female. That officer shifted from looking in the direction of the defendant, to not focusing on the defendant at all. The officers were using flashlights during the encounter, and Officers Delborell and Alarcon spoke with the defendant and female in a calm, normal manner.

**Figure 4. A snip from Officer Alarcon's BWC footage. As explained below, the defendant volunteered to show Officer Delborrell the contents of his bag. The federal officer (circled in yellow) is to the left side of the defendant. This snip shows the general distance between the officers and the defendant during most of their interaction.**



Upon approach, Officer Delborrell greeted and spoke with the defendant and female.

Officer Delborrell:    Hey. How y'all doing, man?

Defendant & Female: Good.

Officer Delborrell:    Good, madame. How are you?

Female:            I'm good.

Officer Delborrell walked westbound around the female and stopped at the left side of the defendant, who was facing north. The conversation continued.

Female:            You [unintelligible] real fast.

6

| Officer Delborrell: | I got you. You got anything on you though? |
|---|---|
| Defendant: | Nah, bro? |
| Officer Delborrell: | Nah? |
| Defendant: | No. |
| Officer Delborrell: | Nothing? |

When Officer Delborrell first questioned the defendant, the defendant looked towards his waist area. At this point, Officer Delborrell believed that the defendant was conducting a security check, and that the defendant possibly had a firearm in his waistband area.

**Figure 5. The defendant looked towards his waist area.**



At this point, Officer Alarcon began to approach the defendant from the defendant's right side. Officer Alarcon teetered back and forth from looking at the defendant and facing the three males. Officer Delborrell continued to assess the situation and asked the defendant about his bag.

| Officer Delborrell: | You ain't nothing in your bag either man? |
|---|---|
| Defendant: | My laptop, do you want to see it? |
| Officer Delborrell: | Okay. I appreciate that, dog. |
| Defendant: | Yeah because . . . . |

<u>Female</u>:                 We are working people . . .

<u>Officer Delborrell</u>:     It sounds like, if you got a laptop I already know he is.

Officer Delborrell spoke in a joking tone. The female and Officer Alarcon laughed.

<u>Female</u>:                 [Laughing] We working, regular working people, we just . . . .

**Figure 6. A snip from Officer Delborrell's BWC footage, which is the opposing angle from Officer Alarcon's BWC in Figure 4 (although 11 seconds apart). Officers Taher (circled in blue) and Duckett (circled in green) are visible in the back of the snip. Federal officers (circled in orange) are in the distance.**



The defendant then took off his bag, put it in front of his waist, unzipped it, and showed Officer Delborrell a laptop. Officer Delborell, still suspicious of potential contraband in the defendant's waistband, believed that the defendant was trying to conceal an object in his waist by keeping his bag in front of him. Officer Delborrell then pointed his flashlight at the defendant's pants. Officer Delborrell continued to assess the situation and asked further questions.

<u>Officer Delborrell</u>:     Nothing in there, man?

<u>Defendant</u>:             Nah. This is my . . .

<u>Officer Delborrell</u>:     Just the green right there or something.

| Defendant: | This my wallet. |
|---|---|
| Officer Delborrell: | Wallet. |
| Defendant: | This is my mask, my little ski mask. And this is my keys. |

The defendant kept his bag in front of his waist area as he pulled objects out of his pockets to show Officer Delborrell. This made Officer Delborrell more suspicious that the defendant was concealing an item. Moreover, as the defendant began showing the officer what was in his pockets, the material of the defendant's pants pulled against what appeared to be a hard object. From here, Officer Delborrell saw a bulge that was not consistent with human anatomy (although not readily apparent in Officer Delborrell's BWC footage). Officer Delborell thus believed that the defendant was armed. Officer Delborrell then questioned the defendant about an object in his waist.

| Officer Delborrell: | Keys, alright. Anything in there right there though? |
|---|---|
| Defendant: | Right where bro? What are you talking about? |
| Officer Delborrell: | Right in there. |
| Defendant: | Oh. My phone. |
| Officer Delborrell: | Not your phone, but like right in there too. In your waist. |

Officer Delborrell pointed to the defendant's waist area three times during this exchange, the exact location where the defendant had concealed a firearm.

| Defendant: | What are you talking about, my waist? No. There's nothing in my waist. |
|---|---|

The defendant then lifted his shirt, as if to reveal his waistband, but simultaneously bent forward. To Officer Delborrell, it appeared that the defendant was attempting to conceal the bulge.

9

**Figure 7. The third time Officer Delborell pointed at the defendant's front waist area, where he saw a bulge.**



Officer Delborrell then patted the area and felt what he believed to be a firearm. Officers recovered a loaded Stoeger STR-9 9 mm pistol from the area. The pistol was upside down, with the handle pointed up, and the barrel resting horizontally towards the right side of the defendant's waist. The defendant did not have a license to carry and was thus arrested.

**Figure 8. A snip from Officer Duckett's BWC footage showing the removal of the firearm.**



**Figure 9. A second snip showing the removal of the firearm.**



**Figure 10. The defendant's Stoeger STR-9 9 mm pistol.**



## LEGAL STANDARD

A seizure occurs for Fourth Amendment purposes when physical force is used to restrain movement, or when a person submits to an officer's show of authority. *See United States v. Veney*, 45 F.4th 403, 405 (D.C. Cir. 2022). The defendant bears the burden to show that he was seized. *United States v. Mabry*, 997 F.3d 1239, 1243 (D.C. Cir. 2021). A "seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Even when an interaction becomes a seizure, the Fourth Amendment allows a police officer to briefly detain an individual if the officer has a "reasonable, articulable

11

suspicion that 'criminal activity may be afoot.'" *See United States v. Edmonds*, 240 F.3d 55, 59 (D.C. Cir. 2001) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). An officer can also frisk the individual if the officer has reasonable articulable suspicion that the individual is armed. *See Terry*, 392 U.S. at 27. Reasonable articulable suspicion requires that, under the totality of the circumstances, an officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *See United States v. Goddard*, 491 F.3d 457, 462 (D.C. Cir. 2007).

## ARGUMENT

The defendant was seized when Officer Delborrell grabbed the defendant and conducted a protective pat down, and the officer had reasonable articulable suspicion to do so based upon the totality of the circumstances—including, (1) the defendant's presence in a high crime area; (2) the defendant's nervousness upon the officers' approach; (3) the defendant's security check towards his waistband area; (4) the defendant's use of his backpack to conceal his front waistband area; (5) the bulge in the defendant's waistband area; and, (6) the defendant's furtive movement when asked about whether he had anything in his waistband. The defendant's contention that he was seized when officers approached the defendant and began to ask him questions is meritless. Up until the moment when Officer Delborrell frisked the defendant, the defendant's movement was not blocked, the officers' encounter with the defendant was consensual, the officers issued no commands, and the defendant did not submit to any show of authority. This Court should thus deny the defendant's Motion.

### A. The defendant was not seized until Officer Delborrell conducted a protective pat down.

The officers did not seize the defendant until Officer Delborrell conducted a protective pat down. *United States v. Vene*y, 45 F.4th 403, 405 (D.C. Cir. 2022) ("For purposes of the Fourth

Amendment a seizure occurs when physical force is used to restrain movement or when a person submits to an officer's show of authority. A show of authority sufficient to constitute a seizure occurs where . . . a reasonable person would have believed that he was not free to leave.") (cleaned up). The officers' initial encounter with the defendant was consensual and did not amount to a "show of authority." *See Florida v. Bostick*, 501 U.S. 429, 429 (1991) ("A consensual encounter does not trigger Fourth Amendment scrutiny. Even when officers have no basis for suspecting a particular individual, they may generally ask the individual questions . . . . ") (cleaned up).

Police officers have the right to approach an individual in a public place. *United States v. Bryant*, 111 F.4th 105, 110 (D.C. Cir. 2024). Questions alone are generally not a show of authority. *See United States v. Gross*, 784 F.3d 784, 788 (D.C. Cir. 2015) (finding a consensual encounter where an officer, who shined a flashlight on a defendant from a moving police car, called out to the defendant and said, "Hey, it is the police, how are you doing? Do you have a gun? . . . "Can I see your waistband?"; and, in response, the defendant lifted his jacket to show his left side). A show of authority is determined to happen under the totality of the circumstances. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Relevant factors to this analysis include whether the suspect was physically intimidated or touched, whether the officer displayed a weapon, wore a uniform or restricted the defendant's movements, the time and place of the encounter, and whether the officer's use of language or tone of voice indicated that compliance with the officer's request might be compelled. *See Goddard*, 491 F.3d at 457; *see also United States v. Delaney*, 955.F.3d 1077, 1082 (D.C. Cir. 2020) (finding that parking a police cruiser three feet next to the defendant's vehicle which was backed up close to an adjacent building in an alley, at night, and shining the police cruiser's take-down light—which was designed to, in part, disorient an individual—at the defendant amounted to a show of authority).

Here, the officers did not make a show of authority during their initial interaction with the defendant. Overall, the officers' encounter with the defendant (and the other four individuals) was consensual, and the defendant was not seized until Officer Delborell grabbed and patted him down. Indeed, all the MPD officers approached the five individuals on the sidewalk in a casual and polite manner. Although the officers were using flashlights when talking with the defendant, it was night at the time of their encounter.

As shown on the BWC footage, only Officer Delborell and, to a lesser extent, Officer Alarcon directly interacted with the defendant. Officers Taher and Duckett were focused on the three males, and the federal officers did not interfere with any of the MPD officer's initial investigation. At all times, including when the defendant was detained, Officer Delborrell spoke with the defendant in a calm and friendly tone. At one point, Officer Delborrell joked with the defendant and female, causing both the female and Officer Alarcon to laugh. Officer Delborrell did not issue any commands to the defendant. He did not order the defendant to show him the contents of his bag or pockets. Instead, it was the defendant who offered to show Officer Delborrell his property. And, it was during this consensual encounter, that Officer Delborrell saw a bulge and acquired the requisite reasonable articulable suspicion under the totality of the circumstances to conduct a protective pat down.

The defendant, however, asserts (at 4) that the "seizure occurred here when law enforcement approached Mr. Wilson and began asking questions of him with one officer on each side of him." The defendant's argument is unavailing. As a factual matter, during Officer Delborrell's initial counter with the defendant, the officers did not restrict the defendant's movements. The defendant stood in the middle of a wide walkway. Only Officer Delborrell was close to the defendant during the initial interaction. Officer Alarcon was to the defendant's right

14

and teetered back and forth from the three males and the defendant. The federal officer was far to the defendant's left, did not directly interact with the defendant, and sometimes shifted his focus elsewhere. In fact, it was not until Officer Delborrell said "1-800," that the officers directed their attention to, and physical restrained, the defendant. In this regard, the defendant's reliance on *United States v. Carter* (an unreported decision), *Delaney* and *Wood* (at 5) is misguided. In *United States v. Carter*, the court found that two officers, who "almost immediately blocked" and "cornered" the appellant on all sides, between a fence on his right, a police vehicle with its emergency lights activated on its left, and standing in front and behind him, seized the appellant. No. CR 20-05 (JDB), 2020 WL 3893023, at *1 and *3 (D.D.C. July 10, 2020). Such an immediate "blocking" and "cornering" did not happen here. Nor was there a clear targeting of the defendant. *Bryant*, 111 F.4th at 110. As set forth above, the primary interaction occurred between the defendant and Officer Delborrell. At times, the other officers seem disinterested in the defendant, and, overall, were not particularly involved with Officer Delborrell and the defendant's discussion. Further, unlike *Carter*, 202 at *1, the officers did not issue any orders to the defendant.

In *United States v. Wood*, an officer followed the appellant into an apartment building and ordered him to "halt right there" and "stop" right in front of an apartment door. 981 F.2d 536, 540 (D.C. Cir. 1992). Further, when the officer ordered the appellant to stop, the officer was so close the appellant that he had "nowhere to go." *Id*. In the instant case, the officers did not issue any orders to the defendant. Further, the officers provided the defendant with ample space to ambulate and move around. Finally, in *Delaney*, D.C. officers boxed in the defendant in a stopped vehicle, in an alley, while shining a disorientating take-down light on him. 955.F.3d at 1082. Simply speaking, these particularized and intrusive facts do not exist in the instant matter.

Ultimately, there was no show of authority on behalf of the officers until Officer Delborrell conducted a protective pat down of the defendant. No officer issued any commands to the defendant. The defendant's movement was not restricted. And everything about the interaction, including the officers' demeanors and the reactions of the defendant and the female indicate that the defendant voluntarily interacted with Officer Delborrell. Like what happened in *Gross*, 784 F.3d at 788, this was a consensual encounter.

### B. The officers had reasonable articulable suspicion to seize the defendant based upon the totality of the circumstances.

At the point when Officer Delborell physically grabbed the defendant and conducted a pat down, the officer had reasonable articulable suspicion that the defendant was involved in criminal activity and armed based on several factors. First, the 1400 block V Street was a high crime area; indeed, within six months of the date of the instant case, there have been at least 17 reports of illegal gun possessions, two reports of robberies, two reports of carjackings, and one report of a burglary occurring within a 200-meter radius of that block. Second, upon the officers' approach, the defendant appeared to be "wide-eyed" and nervous. Third, when Officer Delborrell approached the defendant, the defendant looked towards his waistband, which appeared to be a security check for a potential firearm. Fourth, when Officer Delborrell asked the defendant about his bag, he took it off and held it in front of his front waistband area as if he was trying to conceal an item. Fifth, Officer Delborrell noticed a bulge that was inconsistent with human anatomy in the defendant's waistband area, when the defendant began taking items out of his pockets. Finally, when Officer Delborrell asked the defendant if he had anything in his waistband area and specifically pointed to the spot where he saw a bulge, the defendant made a furtive movement—he lifted his shirt, but simultaneously bent forward, as if he was attempting to conceal the bulge. Based on the

16

circumstances, the officer, viewing the situation in light of his professional experience, reasonably suspected that the defendant possessed a firearm.

In his Motion, the defendant argues, in part, that the various factors that collectively prompted Officer Delborrell to frisk the defendant did not independently provide the officer with reasonable articulable suspicion. The reasonable articulable suspicion inquiry, however, is based upon a review of the *totality* of the circumstances. *Goddard*, 491 F.3d at 462. The defendant's argument (at 6-7), that the high crime characterization of the 1400 block of V Street does "not provide objectively useful context in determining whether the police had reasonable articulable suspicion," is unavailing. While the defendant cites to D.C. Court of Appeals caselaw in support of his proposition, in the D.C. Circuit "the probative value of a neighborhood's reputation as a high-crime area is firmly established." *United States v. Edmonds*, 240 F.3d 55, 60 (D.C. Cir. 2001). In fact, the case law to which the defendant cites supports this proposition. *See United States v. Davis*, 458 F.2d 819, 822 (D.C. Cir. 1972) (holding that the defendant's presence in a high crime area is one valid consideration when making a determination about the validity of a search or seizure). In the instant case, the reputation of the 1400 block of V Street has been quantified with objective data—within six months of the date of the instant matter there have been 17 reports of illegal gun possessions, two reports of robberies, two reports of carjackings, and one report of a burglary occurring within a 200-meter radius of that block.

The defendant's assertion (at 7) that "walking quickly away upon of uniformed police [is] insufficient to provide reasonable suspicion of criminal activity afoot" is moot. The United States does not allege that the defendant walked away from police. To the contrary, the United States alleges, and the BWC footage shows, that the defendant engaged in a consensual encounter with Officer Delborrell. Furter, the defendant's contention (at 7) that "[g]eneral curiosity about police

action is not sufficient for reasonable suspicion" attempts to divorce this one factor from the totality of the circumstances that gave rise to the officers' reasonable articulable suspicion. Nevertheless, akin to the case to which the defendant cited—*United States v. Brown*, 334 F.3d 1161 (D.C. Cir. 2003)—here, to Officer Delborrell, the defendant looked nervous and "wide-eyed," and to the officer it appeared that the defendant was looking for an avenue of escape.

The defendant's challenge to Officer's Delborrell's questioning of the defendant (at 7-8) is equally unavailing. The United States does not dispute that the defendant did not pull "out items on his person that were not illegal." However, it was during Officer Delborrell's questioning of the defendant that the defendant provided further indicia that he was armed—the security check, holding his bag in front of the area where the firearm was, the bulge, and the furtive movement to conceal the bulge. To recapitulate, Officer Delborrell was not looking at each indicium in a vacuum. It was the totality of the circumstances that provided the officer with reasonable articulable suspicion. *Goddard*, 491 F.3d at 462. Further, contrary to the defendant's assertion (at 9), and for the reasons set forth throughout this memorandum, Officer Delborrell's conversation with the defendant prior to the protective pat down was not a custodial investigation, as Officer Delborrell had the right to ask the defendant questions. *Gross*, 784 F.3d at 788.

## CONCLUSION

WHEREFORE, the United States respectfully submits that the Court should deny the defendant's Motion.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By:    _____/s/_____
MICHAEL C. LEE
Assistant United States Attorney
CT Juris No. 436272
601 D Street, NW
Washington, D.C. 20530
202-252-7745
Michael.Lee4@usdoj.gov